## William John Clark *versus* The Commonwealth.

The refusal of the court to discharge a prisoner on the last day of the second term after his arrest, under the 3d section of the Habeas Corpus Act, is essentially a *habeas corpus* proceeding, and does not come up with the record on a writ of error taken by the prisoner after conviction and judgment.

A prisoner, under that act, can only claim his discharge on the last day of the second term after his arrest, when there has been a competent and regularly constituted court, before which he could have been indicted and tried.

The act was designed to prevent *wrongful* restraints of liberty growing out of the malice and procrastination of the prosecutor, but not to shield a prisoner in any case from the consequences of any delay made necessary by the law itself.

Where the array of grand jurors was quashed at two successive terms after the arrest of the prisoner, for informality in selecting and drawing them, he was not entitled to be discharged.

The statute requiring an addition to be given to jurors, is directory merely, and, to be a mark of identity, is properly written as it is commonly known in the community from which the juror is drawn.

The addition of "Mill Boss" to the name of a juror will be presumed to designate his occupation as known and understood in the neighbourhood where he resides.

The right of a president judge to exercise his functions within a county, attached by the legislature to his district subsequent to his election, cannot be questioned collaterally.

The court will judicially take notice of the legislation by which he claims to exercise his office, so far as to hold him a judge *de facto*, and as against all but the Commonwealth a judge *de jure.*

The right and powers of a judge *de facto,* with colour of title, can only be inquired into by *quo warranto,* at the suit of the Commonwealth.  Burnell's Case, 7 *Barr* 34.

ERROR to the Oyer and Terminer of *Montour county.*

This was an indictment charging William John Clark and Mary Twiggs with the murder of Catharine Ann Clark, the wife of plaintiff in error.   The indictment consists of four counts :

The first count charges the defendants with the murder of Catharine Ann Clark, by mixing and mingling white arsenic with magnesia and water, the said defendants knowing the magnesia and water to have been prepared for the use of the said Catharine Ann Clark, and to be taken and swallowed by her.

The second count charges the defendants with the murder of Catharine Ann Clark, by administering to her white arsenic.

The third count charges the defendants with the murder of Catharine Ann Clark, alleging the mixing and mingling of white arsenic with magnesia and water by William John Clark, and that

[Clark *v.* The Commonwealth.]

Mary Twiggs was present, aiding and abetting. Defendants knowing the said magnesia and water to have been prepared for the use of said Catharine Ann Clark.

The fourth count charges Mary Twiggs with having mixed and mingled the white arsenic with magnesia and water, and William John Clark with being present, aiding and abetting.

The defendants were committed on the charge in May, 1857. The first term of the court of Montour county thereafter commenced on the third Monday of September, and the second term on the third Monday of December, 1857. At both these terms the array of grand jurors was quashed, but not on motion of the defendants. On the last day of the December Term, Clark by his counsel moved to be discharged under the 3d section of the Habeas Corpus Act, passed 18th February, 1785, but the motion was overruled. This motion was again renewed when called upon to plead to the indictment at February Term, 1858, and again denied.

At February Term, 1858, the defendant Clark moved to quash the array of grand jurors, on the ground that Matthew S. Ridgway, one of the grand jurors on the venire, was returned without any addition of trade or mystery, estate or degree known in the law, but instead thereof has added after his name " Mill Boss." This motion was also overruled.

The defendant Clark thereupon interposed the following plea to the jurisdiction of the court:—

And now, February 16th, A. D. one thousand eight hundred and fifty-eight, William J. Clark, in his proper person, cometh into court here, and having heard the said indictment read, says that the said court here ought not to take cognisance of the felony in the said indictment specified; because protesting that he is not guilty of the same, nevertheless the said William John Clark says that the felony in the said indictment specified is triable in the Court of Oyer and Terminer of the county of Montour, and not elsewhere; that the court here purporting to be the Court of Oyer and Terminer of the county of Montour is not such court, competent for the trial of the said felony, because the Honourable Alexander Jordan, acting as president judge of the court here, is not now, nor ever has been, a judge of the Court of Oyer and Terminer of Montour county; he, the said Alexander Jordan, not having been elected a judge of the said court of Montour county, according to the provisions of the constitution of the Commonwealth of Pennsylvania; the county of Montour, at the time of the election of the said Alexander Jordan, if ever elected, formed no part of the judicial district over which he, the said Alexander Jordan, was elected to preside or act as a judge, but at the time of said election, the said county of Montour did belong to and form a part of the eleventh judicial district, composed of the counties of Luzerne, Wyoming, Columbia, and Montour, in

[Clark v. The Commonwealth.]

which the Honourable John N. Conyngham was duly elected president judge, wherefore he prays judgment, if the said court, now here will or ought to take cognisance of the indictment aforesaid, and by the court here he may be dismissed or discharged, &c.

To this plea the Commonwealth demurred, the defendant joined in the demurrer, whereupon the court sustained the demurrer, and gave judgment that the defendant answer over. A separate trial having been granted, the defendant Clark was arraigned, and to the several counts in the indictment he pleaded not guilty, and on the 16th February, 1858, a jury was called and sworn, and on the 19th of the same month returned a verdict of guilty of murder in the first degree, and on the following day sentence of death was pronounced against him by the court.

He thereupon applied for and obtained this writ of error, and assigned here that the court below erred in overruling the motion to discharge the prisoner on the 24th December, 1857; in denying the prisoner's application for discharge, when called upon to plead at February Term, 1858; in refusing to quash the array of grand jurors at February Term, 1858; and in overruling the plea to the jurisdiction.

*Robert F. Clark*, for the prisoner.—The preamble to the act discloses what it was intended to accomplish. Before its passage the courts exercised a discretionary power to discharge, and the object of the enactment was to convert into á *right* what the court might grant as a *favour*. That right was a discharge at the second term if not indicted and tried, the same as if he had been tried and acquitted.

The act makes its own exceptions. The array was not quashed upon his motion. All the facts came clearly and distinctly upon the record. The statute is a remedial one, and should be liberally and beneficially expounded in favour of the liberty of the citizen. The terms are plain and explicit, and appear to leave no room for construction. The argument *ab inconvenienti* can in such a case have no force.

Is the operation of this act restrained by judicial construction? These may be classed under three heads: 1st. When the trial is impossible by the rules of law, as in the case of Martin Rinner, 16 *S. & R.* 304.   2d. When the trial is impossible by the act of God, as in the case of William Phillips, 7 *Watts* 366.   3d. When the delay is occasioned by the wrongful act of the defendant, as in Arnold and Others, 3 *Yeates* 263.   Commonwealth v. Prophet, 1 *Brown* 135, is like the present, and there the prisoner was discharged: Commonwealth v. Chauncey, 2 *Ash.* 101.   It is only when a statute is doubtful that an argument from inconvenience will have weight: 9 *Bac. Ab.* 240–255; 4 *U. S. Con. Rep.* 595.

[Clark *v.* The Commonwealth.]

2. The addition of " Mill Boss" is insensible.  It is not, as the Commonwealth's counsel suppose, a *wrong* addition, but *no* addition at all.

3. The plea to the jurisdiction should have been sustained.

It puts in question the power of the legislature to alter a judicial district, after they have districted the state and the judges have been elected by the people of the several districts.

The amendment to the constitution provided " That the president judges of the several Courts of Common Pleas and of such other courts of record as are or shall be established by law, and all other judges required to be learned in the law, shall be elected by the qualified electors of the respective districts over which they are to preside or act as judges."  The state is districted by the legislature and an election for judges is held.  The right vested in the qualified voters of the several districts has been exercised, and the majority have chosen their judge.  Where is the power of the legislature to alter the district after such election?  By what authority does the legislature presume to abridge or nullify the right of any county to a voice in the election of the judge who is to preside in such county, and in whose election the constitution provides they shall have a voice?  What more glaring invasion can there be of a constitutional right than this?—the legislature removed from the bench of Montour county the judge of their choice, and supplied his place for nine years to come with a judge in whose election the qualified voters of such county had no voice.  The power of the legislature to alter, implies the power to abolish a district.  If after the state is districted and an election had, the legislature can abolish entire districts at pleasure, then the constitutional right of the people to elect their judge is a nullity.

*Comly* and *Rhodes*, for the Commonwealth.—The 1st and 2d errors assigned do not arise upon the record.  Nothing can be added to the component parts of a record: Middleton *v.* Commonwealth, 2 *Watts* 286 : and it is clear from this case and the Commonwealth *v.* Church, 1 *Barr* 105, that the opinion of the judge forms no part of the record.  It is so in civil cases where the charge is not excepted to : Holden *v.* Cole, 1 *Barr* 303.  Still less can the written reasons of the defendant below be so considered, or any evidence of the facts contained in them.  Stripping the case then of the statements of defendant, and the opinions of the court, it nowhere appears when he was committed, or that he ever applied for a discharge or the court refused such a motion.  The facts in such a case cannot be brought before this court.  The defendant's only remedy was a writ of *habeas corpus ;* but he cannot wait and take his chance of a trial.  No defendant has yet been discharged under the Act of 1785 after trial and conviction.

[Clark v. The Commonwealth.]

If the facts could be brought before this court properly, the decision of the court below would doubtless be sustained.

2. The 38th section of the Act of 14th April, 1834, requires that the names and *additions* of persons selected as jurors shall be written on slips of paper, but there is no law designating or enumerating what shall be proper additions. By what criterion can it be determined that "Mill Boss" is not a proper addition? As science and the arts advance, new occupations arise, and they cannot be defined beforehand. But a few years ago "Telegraph Operator" would have been unintelligible—now it is well known and understood. The defendant was indicted with the addition of "Puddler," an occupation well known in iron manufacturing districts, but unknown to thousands in other localities.

So "Mill Boss" is a term perfectly well understood in Montour county, as a superintendent of hands in a rolling-mill, and so the juror was known. "Boss" is defined by Webster as a "superintendent." But whether it indicates, at the place of trial, an addition or occupation, is a question of fact which must be left to the court below, and the evidence cannot be removed.

The last error assigned, it appears to the counsel for the Commonwealth, cannot be sustained. The plea of the defendant is simply, and nothing more than, a challenge to the president judge which could not be allowed: 3 *Bl. Com.* 361. As a plea it would require him to sit as judge to decide his own right to the seat he occupied. It cannot be contended that he was not a judge *de facto*; and that being the case, his title to the office can only be determined by *quo warranto* in the Supreme Court. But he was a judge *de jure*. He was duly elected, by the qualified voters, president judge of the 8th judicial district, and that is the office which he now holds. The legislature added the county of Montour to his district, in the exercise of a power which it is absolutely necessary they should possess, and which is denied to them by no section of the constitution. The case of the Commonwealth *v.* McClean, 4 *Yeates* 399, is full to the point. C. J. TILGHMAN says (page 400), "when the present constitution was framed, it was well understood that the power of altering counties had always been exercised by the legislature, and that it was necessary that power should continue. It was understood, too, that certain consequences necessarily flowed from the alteration of counties. In construing the constitution, therefore, we must take care not to destroy those implied powers, without which society could not exist." All this applies as strongly to the alteration of judicial districts. In this case, it was decided that a justice of the peace, commissioned during good behaviour, who resided in the part cut off from the county, for which he was commissioned, ceased to be a justice—that the jurisdiction of a justice of the peace increased or diminished as the county increased or diminished. On the same

[Clark *v.* The Commonwealth.]

principle Judge Conyngham's jurisdiction decreased, when Montour county was taken from his district, and Judge Jordan's was increased, when the same county was added to his, and the vested rights of no one were affected by the change.

The opinion of the court was delivered by

WOODWARD, J.—The plaintiff in error, William John Clark, having been convicted and sentenced for murder in the first degree, in the Court of Oyer and Terminer of Montour county, removes the record into this court, and assigns four several errors, which are to be considered in order.

The first and second errors may be considered together, as they both relate to the refusal of the court to discharge Clark under the provisions of the third section of the Habeas Corpus Act of 18th February, 1785, after he had been held in confinement two terms without indictment or trial.

The first motion for his discharge on this ground was made on the 24th December, 1857, which the court on the same day denied. Then again, on the 16th February, 1858, when he was arraigned, he put in a written refusal to plead on two grounds, one of which was this confinement for two terms and more without trial, although he was ready for trial at both of the terms of court which had intervened. The court again refused to discharge him, and directed a plea of not guilty to be entered for him.

These two applications for discharge were essentially *habeas corpus* proceedings, though not such in form. They were grounded upon the *habeas corpus* statute, and the power invoked was that which the court exercises under the writ of *habeas corpus*, and in no other manner. Viewed in this light, they were distinct and separate from the proceedings which are brought up by our writ of error. They form no part of this record, and are not necessarily or regularly brought up with it. If the judgment of the court in a *habeas corpus* case were reviewable here, which it is not except on another writ of *habeas corpus* issued out of this court, the writ of error which we allowed to the prisoner was not directed to *that* judgment and did not bring it up.

It is perfectly manifest, therefore, that the question raised by the first two assignments of error is not regularly here, and we would be quite justifiable in declining to express any opinion upon it.

Considering, however, that the prisoner's life is at stake, and that his counsel have enabled us to form an opinion on the point by presenting all the necessary documents, and accompanying them with an able and instructive argument, we will, for their satisfaction, allude briefly to the ground on which we think the learned judge of the Oyer and Terminer was right in refusing to discharge the prisoner from confinement. The Act of 18th Feb-

[Clark *v.* The Commonwealth.]

ruary, 1785, in its title and preamble, shows that it was designed to prevent "*wrongful*" restraints of liberty. The third section, after providing that any person committed for treason or felony, and not tried some time in the next term, session of Oyer and Terminer, general jail delivery, or other court after such commitment, shall, upon the last day of the term, sessions, or court be set at liberty upon bail, goes on to say: "and if such prisoner shall not be indicted and tried the second term, sessions, or court after his or her commitment, unless the delay happen on the application, or with the assent of the defendant, or upon trial shall be acquitted, he or she shall be discharged from imprisonment." Now, the evident construction of this section is, that the "term, session, or court" intended by the act is a legally constituted and competent term, session, or court. It meant that a prosecutor should not allow two such terms or sessions of the court, at each of which the defendant might be legally indicted or tried, to elapse without bringing on the prosecution. But to constitute a *competent* court, several things are necessary: the presence of the president judge and jurors, grand and petit, drawn, summoned, and impannelled according to law. Time is another legal requisite. Many president judges are required to hold Courts of Oyer and Terminer in different counties on certain prefixed days; and if the number or duration of trials in one county prevent him from trying all the cases before the law requires his presence elsewhere, the prisoners, whom it has been impossible to try, are not to take advantage of this ineffectual term to claim their release. It is only after two terms, at both of which it was possible to indict and try them according to law, that they become entitled to a discharge. The statute was made to restrain the malice and oppression of prosecutors, and to relieve *wrongful* imprisonment; not to embarrass the administration of the criminal law; not to relieve righteous imprisonment, and to defeat public justice. Such was the construction which this section received from this court in the case of the Commonwealth *v.* The Sheriff and Jailer of Allegheny County, 16 *S. & R.* 304, wherein it was held that a prisoner indicted for aiding and abetting another to commit murder, and not tried at the second term, was not entitled to his discharge on *habeas corpus* when proceedings to outlawry against the principal had been commenced without delay, but there had not been time to finish them. The language of Judge TODD, speaking for the whole court, was very much in point: "What, then," said he, "was the third section of the act intended to provide against? I think it was intended to provide against the abuse of procrastinated trial, to provide not only against the malice of the prosecutor, and against his negligence, against all *his* delays with cause or without cause, against every possible act or want of action of

[Clark *v.* The Commonwealth.]

the prosecutor; but not to shield a prisoner *in any case from the consequences of any delay made necessary by the law itself."*

The only authority invoked against this doctrine is an unreasoned judgment of the Common Pleas of Philadelphia, in 1810, reported in 1 *Brown* 135, which scarcely deserves to be mentioned.

If, then, this prisoner, instead of appealing to the court as upon *habeas corpus,* had pleaded his new trial at the September and December Terms which elapsed after his full commitment, and thus had brought the question upon the present record, it could not have availed him.   It may be well doubted whether upon demurrer such a plea would not have been set aside as wholly insufficient to bar the prosecution, but it is certain the plea would have been fully answered by a replication that no legal panel of jurors had been summoned at these terms.   And if to such a replication the defendant had demurred, judgment must inevitably have gone against him, for the delay would have been attributable to the law itself.   A panel of jurors, constituted according to law, was as necessary an ingredient of a competent court as the president judge himself; and delay in constituting it was as truly the law's delay as that which is caused by the necessary forms of outlawry.

It is no answer to urge that the sheriff and commissioners, who were the officers of the law, caused the delay by not drawing and summoning jurors aright.   The statute which the prisoner invokes was not designed to give *him* this benefit of official negligence. As a member of society he was represented by those officers; and when he entered upon a course of crime, and placed himself in antagonism to society, he assumed the risk of their performing their duties so faithfully as to speed the penalty.   It seems to his advantage that they did not—but to his advantage only in giving him more time for repentance—not as furnishing grounds for his discharge.   The dilatoriness of the agents, who in some sense were his own agents, cannot cancel his responsibilities to society. He *is* not in position to take advantage of it in the manner proposed.

Nothing is lost to the defendant, therefore, by his failing to plead in bar the matter urged upon the judge as ground of discharge.   Our judgment would have been against him on such a record as much as it is upon the record now before us.

The third error assigned is upon the court's overruling the motion to quash the array of grand jurors at February Term. The ground of this motion was that Mathew S. Ridgway, one of the jurors, was not sufficiently indicated by his addition or occupation.   He was called in the panel " Mill Boss."

The 88th section of the Act of 14th April, 1834, relating to juries, requires the name, surname, addition, or occupation of jurors to be given, but this only for the purpose of identification. The provision is directory merely.   And to be a mark of identity,

[Clark *v.* The Commonwealth.]

it is necessary that the addition or occupation shall be written as it is commonly known in the community from which the juror is drawn. There is no question about the identity of this juror. It is not pretended that there is any other Mathew S. Ridgway in Montour county. His Christian and surnames, therefore, sufficiently indicate him; but lest some other man of the same name should be found, the statute required his addition or occupation to be expressed in the language in which it is commonly known. A precisely descriptive addition might not indicate him at all, simply because his neighbours were not accustomed so to think and speak of him. "Mill Boss," we take it for granted, was the popular designation of his occupation; and therefore it is quite immaterial whether the words are capable of strict definition as applicable to a rolling-mill, or a mill of any other description, they were the appropriate words for the occasion.

The fourth and last error assigned is for overruling the plea to the jurisdiction.

Counsel for the Commonwealth insists on calling it a mere challenge of the president judge, which they argue is not allowable. In form it is a special plea; and that the prisoner may have the full benefit of it, we will treat it as a plea to the jurisdiction. It denies that Judge JORDAN, whom it recognises as "acting as president judge of the court here," was ever elected a judge of the Court of Oyer and Terminer of Montour county, agreeably to the constitution and laws of the Commonwealth; and alleges that Montour county, at the time of the election of judges, formed no part of Judge JORDAN's district, but belonged to and formed part of the 11th judicial district, composed of the counties of Luzerne, Wyoming, Columbia, and Montour; and that Judge CONYNGHAM was duly elected president judge of said district.

To this plea there was a demurrer, a joinder therein, and judgment for the Commonwealth.

A very important question upon the constitutional power of the legislature so to alter judicial districts as to transfer a judge to the courts of certain counties who was never voted for in those counties, was intended to be raised by this plea; but, unfortunately for the prisoner, it cannot be raised in this form.

His plea admits that Judge JORDAN is a judge *de facto;* and if it did not admit this, we would take judicial notice of the legislation which placed him in the courts of Montour county, so far as to hold him to be a judge *de facto.* That legislation is at least a colourable title to his office. Can the rights and powers of a judge *de facto,* with colour of title, be questioned in any other form than by *quo warranto,* at the suit of the Commonwealth? Assuredly not.

That a private relator could not test the validity of a judicial commission, even by *quo warranto,* was decided in Burrell's Case,

[Clark *v.* The Commonwealth.]

7 *Barr* 34, and the principle has been applied in a variety of other cases: see 7 *S. & R.* 386; 2 *Rawle* 139; 16 *S. & R.* 144; 2 *W. & S.* 37; 8 *Harris* 415; 5 *Mass. Rep.* 230; 4 *Gill & Johnson* 1; 10 *B. & C.* 230; 11 *Ad. & E.* 949.

But if a private suitor may not, by the *appropriate* process, question a judge's commission, when he has a chance to be heard in defence of his right, much less may such a suitor do it collaterally in an action to which the judge is not a party, and where he cannot be heard by himself or counsel.

If this defendant may plead to the jurisdiction of the judge, every defendant in Montour county, whether in civil or criminal proceedings, may do the same; and Judge JORDAN, instead of trying the rights of parties, will be continually engaged in defending his own. Not merely in defending them, but in adjudicating them, contrary to that law, which is too elementary even for the bill of rights, that forbids a man to judge his own cause.

He is a judge *de facto*, and as against all parties but the Commonwealth, he is a judge *de jure* also. If the legislation complained of is to be tested, it must be at the instance of the Attorney-General or of some public officer representing the sovereignty of the state. The notion that the functions of a public officer, or of a corporation existing by authority of law, can be drawn in question (I do not mean as to the mode of their exercise, but as to their right of existence), except at the pleasure of the sovereign, is a mistake that springs from the too prevalent misconception that it is the duty of everybody to attend to public affairs. Public officers are provided for public duties, and the remedy for delinquencies is of frequent recurrence, is specific and effectual. This plea to the jurisdiction cannot avail the defendant, even to raise the constitutional question intended.

Having thus given deliberate attention to all the errors assigned upon the record, and to whatever was urged in their support, the painful duty only remains for us to pronounce the judgment affirmed.